## ALEXANDER DE WITT *vs.* IVERS R. HARVEY & others.

By a deed of land bounding on a canal supplying mills, " with the privilege of crossing to and from and around the same, and of erecting and using tenter bars in some convenient place near the same, with the privilege also of drawing water from said canal at all times when it may be done without injury to said mills, sufficient for the purposes of a fulling mill and shearing machine, but for no other purpose whatever," the right to use the water for a fulling mill and shearing machine is not made appurtenant to the land granted. Nor is such right extinguished or surrendered by the dam being subsequently taken down by all the owners of water power at that spot, and rebuilt in such a manner as to flow all the land granted by this deed.

So of a deed granting another lot of land bounding on the same canal, " with the privilege to pass to and from the premises, and to lay wood and timber for the use of the same; also a water privilege for a carding machine, with liberty of converting the water to any other use."

A grant of " the privilege of drawing water from said canal at all times when it may be done without injury to the forge or to the grist mill, sufficient for the purposes of a fulling mill and shearing machine, but for no other purpose whatever," gives no right to use the privilege for any other purpose.

A grantee of the privilege of drawing water from a canal for a particular purpose, and for that only, at all times when it may be done without injury to certain other mills, may have his right set off to him, in equity, under *St.* 1854, *c.* 74, to be used for that purpose only.

A deed of an equity of redemption of real estate, given by an officer to a purchaser thereof at a sale on execution since the Rev. Sts. took effect, passes no title as against a subsequent attaching creditor without notice, if not recorded within three months, pursuant to Rev. Sts. *c.* 73, § 38, although the land was seized on the execution before those statutes took effect.

A and B, being tenants in common with C of certain land and water power, A and B jointly owning six eighths thereof, and A owning an additional eighth, made four deeds on the same day, by one of which A conveyed to B three eighths of a part of the land, on which B had built a mill, and three eighths of the water power; by the second, B conveyed to A three eighths of another part of the land, on which A had built a mill, and three eighths of the water power; by the third, A conveyed to D one eighth of a piece of land described, with one undivided eighth of the whole water power, reserving the water power conveyed by each of the first two deeds and by the fourth, A and B conveyed to D another parcel of the land " for the purpose of erecting a paper mill thereon, together with the privilege of drawing and using one eighth of the water." *Held*, that the deeds were valid as against all persons except C, the cotenant who did not join in them; that they were to be treated as parts of the same transaction, and therefore to be construed together; and that D took by his two deeds only one eighth of the water power.

Upon a petition at law for partition of real estate described as " bounding on the N. River," and as used for mills, the court set off to the petitioners, "as their full share or purparty of the whole," a parcel of land, by metes and bounds, " together with the privilege of forever keeping open for the free passage of the canal which passes through this parcel from the parcel to N. River." *Held*, that this partition did not so divide the water power which was parcel of the estate described in the petition, as to be a bar to a bill in equity under *St.* 1854, *c.* 74, to divide all said water power.

BIGELOW, J.*   The bill in the present case is brought under the provisions of *St.* 1854, *c.* 74, by which jurisdiction in equity is given to this court to compel the division of mill privileges and water rights in which several persons are interested as joint tenants, tenants in common or otherwise.   The parties to the suit are owners of the entire water power and mill rights situated on the Nashua River in the towns of Groton and Pepperell at the place described in the bill; and both use the same dam and draw water from the same pond.   As the pleadings put in issue the title of the plaintiff, as set out in his bill and claimed by him, the case necessarily involves an inquiry into the respective rights of the parties to the water of the whole river at the place where their mills are situated.   To understand the result at which the court have arrived, it will be more intelligible to consider the title of the plaintiff in the order in which he has stated it in the bill, with the several objections raised thereto by the respondents in their answer, and upon which they have relied in the arguments of their counsel.

1. The first question arises as to the right of the plaintiff to the water power conveyed by the deeds of May 6th 1813, called the "fulling mill privilege," and of January 27th 1817, called the "carding machine privilege." †   It is not denied

---

* THOMAS, J. did not sit in this case.

† In the deed of May 6th 1813, the premises granted are described thus: " A parcel of land lying in said Pepperell, between the canal supplying the forge and the Nashua River, bounded as follows, viz: Beginning at a stake and stones by said canal; thence north by said canal thirty six feet to a stone; thence easterly twenty four feet to a stone; thence southerly thirty six feet to a stone; thence westerly twenty four feet to the bounds first mentioned; with the privilege of crossing to and from and around the same, and of erecting and using tenter bars in some convenient place near the same; with the privilege, also, of drawing water from said canal at all times when it may be done without injury to the forge or to the grist mill, sufficient for the purposes of a fulling mill and shearing machine, but for no other purpose whatever."

In the deed of January 27th 1817, the description is thus: " A certain shop near the forge in said Pepperell, which was built for a carding machine, and the land under and near the same, and bounded, beginning at the canal and passing in a straight line five feet from the soutl westerly end of said shop, even with

that the plaintiff has by mesne conveyances a grant of these privileges and water rights. But it is contended by the defendants that they are extinguished and surrendered, because in the year 1841, the grantors of the plaintiff, then owning the privileges and rights created by the deeds of 1813 and 1817, together with all the other owners of the water power at the place in question, took down the dam then erected across the river, and rebuilt it in such manner as to overflow and perpetually cover with water the land originally conveyed with these rights of water, so that it could not be used and occupied for any purpose. This argument proceeds on the ground that by the true construction of the deeds of 1813 and 1817 the rights of water thereby conveyed were inseparably connected with and appurtenant to the land granted by those deeds. But there is no language from which any such intent in the parties to those conveyances can be inferred. On the contrary, the rights of water are conveyed as distinct and substantive subjects of grant, without any restriction as to their use in connection with the land granted or any other designated parcel. Although in their nature appertaining to land, and only capable of beneficial use and enjoyment for the purpose of driving mills to be erected in the vicinity of the dam by which the head of water was raised so as to draw water from the pond; they were nevertheless proper subjects of grant by deed, and became vested thereby in the grantees by an absolute title, subject only to the restrictions

---

the front thereof; thence by the front of the northwesterly end; thence by the northeasterly end to the canal; thence by the canal to the place of beginning; with the privilege to pass to and from the premises, and to lay wood and timber for the use of the same. Also a water privilege for a carding machine, and breaker and picker for the same, and also for sawing combs, with liberty of converting the water to any other use, providing the quantity of water is not more than sufficient for the above purposes; provided, always, that the water privilege aforesaid is not to be used or exercised to the injury of the works erected on said canal, and particularly the grist mill and forge. Also, the said grantee is to have the liberty to cut a passage under the grist mill for the water to pass off, if such passage should be found necessary, and also to place the wheel below the said shop and partly under the grist mill, if found to be convenient, but so as not to injure the said mill."

expressly named in the deeds, and to those which necessarily arise and grow out of the subject matter of the grant. They stand precisely as if granted by deeds which contained no conveyance of land. They were rights of water, duly granted by deed, not appurtenant to any particular parcel of land, which the owner might use at any place or in any manner, so long as he did not interfere with or impair the rights of others. When therefore by the erection of the dam the parcels of land in connection with which these rights had been used became submerged, it was the right of the owner to use the water at any other mill or upon any other parcel of land situated on the same dam, where it could be enjoyed without infringing on the other rights and privileges to which these grants were originally made subordinate. *Hurd* v. *Curtis*, 7 Met. 114.    *Bardwell* v. *Ames*, 22 Pick. 358. Angell on Watercourses, § 146.

It is also urged that the deed of 1813, under which the plaintiff claims, conveys no right to the use of water, except for the purposes of a fulling mill and shearing machine. And such, we think, is the true construction of the deed. It is in terms a conveyance for those uses, "but for no other purpose whatever." These words operate as a restriction upon the right, and confine the use of the water to the distinct purposes for which it was conveyed. It does not come therefore within the class of cases where the reference to a particular kind of mill, or mode of using the water, can be regarded as an indication and measure of the quantity of water power intended to be conveyed; but it is a grant of water power restricted to certain designated and specific uses and which cannot be rightfully appropriated to any other. *Ashley* v. *Pease*, 18 Pick. 268. But although thus restricted, the title to it is vested in the plaintiff, and he has the right to have it set off to him, to be enjoyed and used for the purposes to which it was originally limited.

2. In the year 1834 all the rights of water and mill privileges on the river at the place in question, except the rights created by the deeds of 1813 and 1817, above referred to, had become vested in James Lewis. This is conceded. On the 13th day of October in that year, he conveyed the same to eight persons as tenants

in common.　Of the estate thus vested in these eight persons it is also admitted that prior to June 30th 1836 three eighths had become vested in Horatio Shipley, three eighths in Enoch Woods, and one eighth in Samuel D. Shattuck.　As to the title to the remaining eighth which was originally conveyed by Lewis to Thomas L. Blake in October 1834, it appears that on the 16th of April 1836 Blake conveyed to Enoch Woods this eighth by a deed which was on that day duly recorded.　But it also appears that the right in equity of Blake to this same eighth was taken on the 11th of April 1836 upon an execution duly issued against Blake, and that it was sold on said execution on the 16th of May following by the sheriff, who conveyed the right of Blake on the same day by a deed in due form of law to Frederick F. Parker, under whom the defendants claim.　This deed, however, was not recorded until more than two years after the sale, to wit, on the 11th of September 1838; and there is no averment in the answer or evidence in the case that Woods had any notice of the seizure or sale of Blake's interest on the execution, or of the conveyance of it by the sheriff, until the deed was recorded.

　　Upon this state of facts, we think it entirely clear that the conveyance by Blake to Woods, although subsequent in point of time to the taking of the right of Blake on execution, vested in Woods the title to the estate, in preference to the deed of the officer to the purchaser of the right in equity.　It is true that the estate was taken on execution before the revised statutes went into operation, and when it was not necessary to record the deed of the sheriff within three months after the sale, as is required by Rev. Sts. *c.* 73, § 38.　But before the sale took place, the revised statutes had gone into operation, and then it became necessary to conform the proceedings in the levy of the execution to the provisions therein contained, because it is expressly enacted by Rev. Sts. *c.* 146, §§ 1, 5, that they should take effect from and after the last day of April 1836, and the proceedings in all cases after that date should be conformed to the provisions thereof.　It follows that the lien created by taking the land on execution on the 11th of April 1836 was not duly perfected by a record of the sheriff's deed within three months after the sale as

required by Rev. Sts. *c.* 73, § 38. The conveyance by the sheriff did not therefore take effect as against Woods, who was a *bona fide* purchaser of the estate from the judgment creditor subsequently to the time when the land was taken on execution, but who had neither actual nor constructive notice thereof or of the sale by the sheriff and his conveyance to the purchaser of the equity on the 16th of April following. *Houghton* v. *Bartholomew,* 10 Met. 138. The result is that the title to this eighth prior to the 30th of June 1836 had become vested in Enoch Woods. He was thus the owner of four eighths, Shipley of three eighths, and Shattuck of one eighth of the whole water power of the river at the place in question.

3. Such being the title of the respective owners on the 30th of June 1836, it becomes necessary to consider and determine the effect of the conveyances set out in the bill, which were made on that day by Shipley and Woods. The plain intent of the parties in making these conveyances was to terminate the tenancy in common in a part of the joint estate. They conveyed to each grantee a separate and several interest, by which each was to become the owner of a distinct parcel of land with a definite right or proportion of the water connected therewith. Although a conveyance by a tenant in common of a portion of the estate in severalty is invalid as against his cotenants and can be avoided by them, it is nevertheless good by way of estoppel against the grantor and his heirs, and is valid against all persons unless avoided by the cotenants. *Varnum* v. *Abbot,* 12 Mass. 474. *Blossom* v. *Brightman,* 21 Pick. 283. *Dall* v. *Brown,* 5 Cush. 289. The only person who had the right to avoid these consequences was Shattuck, the owner of one eighth, who was not a party thereto. But he has never disaffirmed them. On the contrary, his title subsequently became vested in the plaintiff, who now holds the same, and claims title under and by virtue of said conveyances. Besides; the deeds to Whitcomb and Rice of June 30th 1836, under which the defendants claim, expressly recognize and adopt the division of the common estate, so far as it was intended to be effected by the conveyances of that date. These deeds then, being executed at

the same time, bearing the same date, and relating to the same
subject matter, are to be taken as one transaction, and to be con-
strued together as if they made parts of one and the same
instrument.  By the deed from Woods to Shipley, three eighths
of the piece of land on which Shipley had then built a paper
mill were conveyed, with three eighths of the water power which
belonged to Lewis in October 1834, and which comprehended
all the water power of the river except that included in the deeds
of 1813 and 1817.  By the deed from Shipley to Woods, three
eighths of the piece of land on which Woods then had a saw mill
were conveyed, with three eighths of the same water power con-
veyed by the deed of Shipley to Woods.  The purpose and intent
of these deeds was to vest in Woods and Shipley six eighths
each in the parcels of land conveyed to them respectively ; that is,
three eighths which each owned therein by previous conveyances,
and three eighths by these deeds, which at the same time set
apart three undivided eighths of the water power to each of said
parcels respectively, to be used for carrying the mills then
erected thereon.  These deeds disposed of six eighths of the
water power by assigning three eighths to each mill.  By the
deed from Woods to Whitcomb and Rice, made on the same
day, one eighth of a certain piece of land therein described was
conveyed, with one undivided eighth part of the water in the
river, reserving out of said grant the water power conveyed by
Woods on the same day to Shipley for the use of his paper mill
by the deed above referred to, being three eighths ; and also
the water necessary to carry the saw mill belonging to Woods,
being also three eighths.  The effect therefore of these deeds
was to recognize and confirm, as between Shipley and Woods,
the title which each had previously acquired to three eighths
of the water by mesne conveyances from Lewis, and to appro-
priate them to the mills owned by them respectively, to be
enjoyed in severalty by each ; and also to convey to Whitcomb
and Rice the one eighth of the water power, which Woods had
acquired by mesne conveyances from Blake.  Thus seven eighths
of the whole water power which belonged to Lewis in 1834 were
conveyed and appropriated, leaving one eighth as the share of

De Witt v. Harvey & others.

Shattuck, the other cotenant, who was not a party to the trans-
action.   In addition to these conveyances Shipley and Woods,
on the same day, conveyed to Whitcomb and Rice a piece of
land described as adjoining a new canal then being dug, " said
premises being for the purpose of erecting a paper mill thereon,"
together " with the privilege of drawing and using one eighth
of the water " originally owned by Lewis in 1834.   It cannot
be contended, consistently with a proper construction of all the
deeds executed by the parties on that day, that this was a
conveyance of an additional right of water.   It was only a
grant of the piece of land described, with the privilege of using
the one eighth of the water conveyed by Woods by the deed
above named to Whitcomb and Rice on the same day, in
connection with or as appurtenant to this parcel of land.
This must be so, because, as we have already seen, by the deeds
executed on the same day, and forming part of the same trans-
action, all the water power belonging to Shipley and Woods,
being seven eighths, had been already conveyed and appro-
priated.   Construing all the deeds together, it is plain that three
eighths of the water power were set to the paper mill of Shipley,
three eighths to the saw mill of Woods, and one eighth was con-
veyed to Whitcomb and Rice, with the right to use it in con-
nection with the parcel of land conveyed to them by the other
deed of the same date for the purpose of erecting a paper mill;
thus exhausting the whole water power to which Shipley and
Woods were entitled at the time of making these conveyances,
and leaving only Shattuck's share unappropriated.   The land
thus divided, with the water appropriated to the several mills of
the parties, continued to be used by the respective owners of the
property according to these conveyances until the year 1844,
when proceedings were had for a partition of the estate by legal
process.

4.  This brings us to the remaining question in the case, which
arises on the true construction and legal effect of the judgment
for partition rendered by the court of common pleas for this
county at June term 1844 on the petition of Whitcomb and Rice.
At the time when the petition for partition was presented, in

December 1843, the rights of Woods, Shipley and Shattuck had become vested in the Pepperell Manufacturing Company, under whom the plaintiff claims, and Whitcomb and Rice owned the rights which they had acquired by the deeds of June 30th 1836. There can be no doubt that a judgment for partition is conclusive between the parties thereto and their privies in estate. Although it may be erroneous, and may not conform to the real title of the parties, it is nevertheless binding until reversed by writ of error or other due process. Rev. Sts. *c.* 103, § 33. *Austin* v. *Charlestown Female Seminary*, 8 Met. 196. *Foster* v. *Abbot*, 8 Met. 596. The judgment for partition in the present case is therefore conclusive as to the rights of the parties thereto and those claiming under them, so far as it properly includes and adjudicates upon them ; and cannot be impeached or set aside in this suit.

We think it equally clear, that it must now be assumed that the petition for partition included the entire estate held in common, that is, the water power, as well as the land ; and that the whole was before the commissioners who made the partition, which was confirmed by the judgment of the court. This results not only from the well settled rule of law, that a tenant in common cannot enforce a partition of part of one common estate, but must include the whole in his petition ; *Miller* v. *Miller*, 13 Pick. 237 ; but it also follows from a proper construction of the terms of the petition and the return of the commissioners.* It is true that the water power is not specifically

---

* In that petition Whitcomb and Rice represent " that they are seized in fee simple and as tenants in common of and in a certain real estate, situated in the easterly part of Pepperell, in said county of Middlesex, being a part of the Forge Lot, so called, containing five acres, more or less, and bounded as follows " : [among other bounds, " southerly on the Nashua River,"] " excepting and reserving out of said premises two certain parcels of land, in and to which said two parcels of land the said Whitcomb and Rice disclaim all right and title," (being the lands described in the deeds of 1813 and 1817, where the fulling mill and carding mill formerly stood, *ante*, 487, 488, *note ;*) " that the said Whitcomb and Rice are seized of seven eighths of a certain part of the premises, of two eighths of a certain other part of the premises, and of one eighth of the remainder, with the proprietors of the Pepperell Manufacturing Company and certain other

named in either; but the whole land is described in the petition by metes and bounds extending to the thread of the river, com-prehending substantially all the estate owned by the parties. That the part assigned to the petitioners by the return of the commissioners was intended to include a right of water as appurtenant thereto is manifest from the fact that the privilege of keeping open a canal for the free passage of water was expressly reserved to the petitioners thereby, and that a paper mill had been previously erected and used on the premises by means of said canal. Besides, the water power was parcel of

persons to the petitioners unknown;" [the part of which they are seized of seven eighths is then described;] "the part of which they are seized of two eighths comprises the whole of the remainder of the premises, excepting out of said remainder thereof the saw mill now or lately occupied by Samuel P. Shattuck, together with the land on which said saw mill stands, and the privi-leges and appurtenances to the same belonging; and also excepting thereout the paper mill, now or lately occupied by the said Pepperell Manufacturing Company, with the land under the same, and the privileges and appurtenances thereunto belonging; and they are seized of one eighth part of said saw mill with the priv-ileges as aforesaid, and of one eighth part of the said paper mill with the privileges as aforesaid, excepting that part thereof which stands on the ground on which the shop built for a carding machine formerly stood, as hereinbefore described; that they cannot occupy and improve the said parts to any advantage while they lie in common and undivided as aforesaid, but wholly lose the profits thereof. Wherefore they pray that notice may be issued in due form of law, and that the parts of the said Whitcomb and Rice may be set off to them in common, but distinct and separate from the parts of which the said proprietors of the Pepperell Man-ufacturing Company, and other persons to the petitioners unknown are seized."

Upon that petition, notice was duly issued, served, and published; and the court of common pleas adjudged "that partition should be made as prayed for," and appointed three persons "a committee to make partition accordingly," and issued a warrant to them, "to make partition of the premises, so far as it respects the said petitioners, by setting off to them their said parts thereof in common, by proper metes and bounds, to hold to them in severalty." The commissioners, in their return, assigned to Whitcomb and Rice, "as their full share or purparty of the whole" [estate described in the petition], a certain parcel of the land, by metes and bounds, "together with the privilege of forever keeping open for the free passage of the water in the canal which passes through this parcel from said parcel to Nashua River, and reserving to the owners of the lands and mills not included in this parcel a right of way from the town road in two places, as now used to their said land and mills." And this return was accepted by the court.

the real estate set out in the petition, which was described therein as being used for mills, and included in terms the privileges and appurtenances thereto belonging.

But it does not follow as a necessary consequence that the water power and right of water must have been actually divided by the partition, or that the precise quantity or portion thereof belonging to the petitioners was thereby measured and set apart, so as to separate it from the residue. It is quite doubtful whether it was competent for the court, under Rev. Sts. *c.* 103, especially in view of the provisions contained in §§ 25, 26, to empower commissioners to divide and set out, by metes and bounds, a dam, water powers and mill privileges owned in common, in such manner, that each owner should possess in severalty only his aliquot part. *Miller* v. *Miller*, 13 Pick. 237. *Adam* v. *Briggs Iron Co.* 7 Cush. 366. Incorporeal hereditaments· and easements in real estate are often incapable of division or separation among cotenants, although the nature and extent of their rights therein may be distinctly ascertained and defined. Indeed, we do not doubt that the *St.* of 1854, *c.* 74, under which this suit is brought, was enacted for the very purpose of supplying a defect in the proceedings for partition at law, and enabling owners of water power to obtain a practical and actual division of water in its use among their cotenants by means of a decree in equity; which could not be well effected by the provisions for partition at law under Rev. Sts. *c.* 103. It is apparent that the water in its physical condition in the pond, supplying both parts of the common estate, and the dam by which the head of water was raised, were not capable of division in the same manner and to the same extent as other real estate. They must necessarily remain, after a partition, in a certain sense common and undivided, although the rights of the respective owners thereto and the proportions of the common estate belonging to each might be thereby fixed and determined.

All that the commissioners could well do, under the authority vested in them by the court, was to set off by metes and bounds the land to which the petitioners were entitled, and to assign to them therewith the share or proportion of water in the common

De Witt *v.* Harvey & others.

pond, raised by the common dam, which they were to draw and use as appurtenant to the land set off. This was a division of the entire estate, sufficient to discharge them of their legal duty; and this was, in fact, all that they undertook to do. They did not divide the dam or the pond, or apportion by gates, sluice-ways, flumes or other fixtures of a prescribed construction and size, the mode in which the water was to be measured or practically divided in its active use by the petitioners. To this extent the water power remained undivided.

In taking this view of the partition we do not overlook the fact, to which we have before alluded, that there was assigned to the petitioners a right to keep open a canal for the free passage of the water. It is quite clear that this was not intended as a measure or standard of the quantity or proportion of water to which they were entitled. From an inspection of a plan of the entire estate, it is evident that this right was intended only to give to the petitioners the privilege or easement of keeping open a raceway or outlet through the land of the respondents, by which the water used on the land set to the petitioners might discharge itself into the river. The canal through which the water was supplied to their mill-site was dug through the land assigned to them. It was therefore wholly within their own control, and no express assignment of it, or of the right to take water through it, was necessary in the partition. But it was essential, in order to enable them to use the water which passed through their canal, to give them the right to discharge it through the land of the respondents; and for this purpose, to secure to them the right of keeping open the canal therein. Besides, on the theory that the canal referred to in the partition was intended to include the passage of water to the mill of the petitioners, there is no limit prescribed in the partition to the size of the canal or its capacity. For aught that appears the entire water of the river might pass through it. There were at the time of the partition other valuable mills situated on the dam, to which were annexed important rights of water, which the commissioners would not have overlooked or disregarded. No such division of the water, as would have been effected by the use of the canal

42*.

as a measure of the petitioners' right, had ever before been prac-tically made by the parties in the enjoyment of their respective privileges after the deeds of partition of June 30th 1836, and no right to the water which might be made to flow through this canal was claimed in the petition. Under these circumstances, it cannot be presumed, in the absence of any clear and positive language in the partition requiring such a construction, that so uncertain and indefinite a measure of water, as a canal without any fixed or prescribed capacity or dimensions, was intended to be established. *Hurd* v. *Curtis,* 7 Met. 113.

These considerations lead us to the true construction and effect of the partition, so far as the right of water was compre-hended within it. The judgment for partition, as we have already seen, did assign to the petitioners a proportion of the water power, to be used as appurtenant to the land set off by metes and bounds. Upon reference to the description of the land in the report of the commissioners, it will be found that it includes the parcel conveyed or attempted to be conveyed in severalty on the 30th of June 1836 by Shipley and Woods to Whitcomb and Rice, for the purpose of erecting thereon a paper mill, and in connection with which the one eighth of the water conveyed on the same day to them by Woods was by the terms of the conveyance to be used and enjoyed. Upon it Whitcomb and Rice had erected a paper mill, which they had occupied for their own sole use and benefit for a part of the time after 1836 and before their application for partition. In their petition they claimed a greater interest in this parcel of land than in other portions of the common estate, namely, seven eighths, being, as they clearly intended, the whole of it, except the one eighth which in 1836 belonged to Shattuck. In this state of the case, it seems to be reasonable, and most consistent with the actual title and the real rights of the parties, to infer that the commissioners intended to assign to the petitioners the right of water, being one eighth, which was conveyed and annexed to the parcel included in the land set off by them by the deeds of June 30th 1836. Although the entire tract, as set off by metes and bounds, had never before been conveyed by

the same boundaries, and there had been no water power or specific part of the water previously appropriated to that precise tract, yet it is clear that the part of it on which the paper mill had been erected, which was the part constituting its chief value, had been previously conveyed to Whitcomb and Rice by all the owners of the common property except one; and that there had been conveyed to them also a certain and fixed proportion of the water, namely, one eighth, intended for and appropriated to that piece of land, and actually used and enjoyed with it under the deed of June 30th 1836. This one eighth was therefore properly to be deemed and taken as the appurtenance to that parcel and the paper mill which had been erected there, and therefore may well be held to have been assigned by the commissioners to the petitioners as their proportion or share of the water power.

This conclusion is greatly strengthened by the consideration, that by no other reasonable construction of the partition can it be held that any water power was thereby conveyed to the petitioners. Unless they took it as appurtenant to the land set off by metes and bounds, they could have acquired no title thereto. There is no specific designation of the water power which they were to enjoy or use in connection with the land set off to them, and no precise quantity is assigned to them therewith. It is therefore clear that the petitioners would be entitled to none by force of the judgment for partition, except as appurtenant to the land set off to them.

By the judgment for partition, then, the proportion of the entire quantity of water in the river belonging to the petitioners was fixed and determined. But it was still left practically undivided, because no mode of measuring this quantity, or dividing it from the residue in its practical use, was thereby prescribed. The former judgment for partition is therefore no bar to this suit. The *St.* of 1854, *c.* 74, gives a new remedy to parties owning mill privileges and rights of water in common, by which they can enforce in equity by specific decrees adapted to the case, the actual practical division of the water, which could not have been effected under the proceedings at law for

partition.    *Adam* v. *Briggs Iron Co.* 7 Cush. 366.    *Tyler* v. *Wilkinson,* 4 Mason, 413.    *Belknap* v. *Trimble,* 3 Paige, 577.

*Decree accordingly.*

*B. F. Butler & D. Foster,* for the plaintiff.

*J. G. Abbott,* for the defendants, to the point that the commis sioners appointed by the court of common pleas had power to divide the whole estate, including all the water power, and could not make partition of the land alone, and that the former partition was therefore final, and a bar to this suit, cited Rev. Sts. *c.* 103, § 25; *Miller* v. *Miller,* 13 Pick. 239; *Adam* v. *Briggs Iron Co.* 7 Cush. 370; *Partridge* v. *Luce,* 36 Maine, 16; *Morrill* v. *Morrill,* 5 N. H. 134; *Hills* v. *Dey,* 14 Wend. 204; Woolrych on Watercourses, 117.