HENRY SAUNDERS and DELIA N. SAUNDERS, his wife, Appellants, *v.* WILLIAM HANES, Respondent.

An indenture, executed in 1804, witnessed: "That the said parties of the first part, in consideration of the rents and covenants hereinafter specified and reserved, have granted and devised, and by these presents do grant and devise unto the said party of the second part, in his actual tenure now being, the privilege and right of erecting, and to erect one saw mill and one grist mill on the mill seat situate" on a certain river. "And also the privilege and right of erecting and to erect a dam from the south-easterly side or bank of said creek or river, across the same (so far as the right of the parties of the first part to the waters of the same extend) for the purpose of flowing the waters of said creek or river, for the use of the said grist and saw mill, and for the use of such mills as may be erected hereafter by the parties of the first part, their heirs or assigns, below the bridge aforesaid; and also the privilege and right of taking, using and enjoying so much of the land adjoining the said mill seat as may be absolutely necessary to, and for the accommodation of the said grist and saw mill, restricting and binding the said party of the second part, his heirs and assigns to the land contained within one chain in breadth from the bank of said creek or river, the same having been heretofore reserved by the Hon. James Duane; to have and to hold the said mill seat, mills to be erected thereon, land and dam forever, upon condition that the said party of the second part, his heirs, executors, administrators and assigns shall faithfully yield, render and pay therefor, unto said parties of the first part, their heirs," etc., a specified rent; and also "that the said party of the second part, his heirs and assigns, shall at

all times keep the aforesaid dam in good and sufficient repair," and allow sufficient water to pass for the purposes of mills to be erected below by the parties of the first part; with right of reentry for failure of payment or violation or non-performance of covenants and with a covenant by " the party of the second part, for himself, his heirs, executors and assigns," to pay the rent and observe and fulfill the covenants and conditions.— *Held*, in ejectment (GRAY, C., *contra*), that the grant was in fee, notwithstanding the absence of words of inheritance from the *habendum* clause.

Every part of a deed may be resorted to for the purpose of ascertaining its true meaning, and the expression " restricting and binding the said party of the second part, his heirs and assigns, to the land contained within one chain" being repugnant to a limitation of the estate to the life of the lessee, and being first in order in the instrument, must control. (LEONARD, C.)

(Argued January 9; decided May 1, 1871.)

APPEAL from an order of the General Term of the Supreme Court, in the fourth district, reversing a judgment for the plaintiff and granting a new trial.

This action was for the recovery of the possession of certain premises, claimed by the plaintiffs in fee, situate in the county of Schenectady, described in the complaint as " the mill seat situate and being on the south-easterly side of the Schoharie creek or river, and immediately above and near to the bridge as it is now (May 25, 1863) standing over said creek or river, and abutting on and connecting the turnpike road leading from Albany to Cherry Valley;" into which the plaintiffs alleged the defendant had entered and unlawfully withheld it from them. The answer, besides putting in issue each allegation in the complaint, alleged that neither the plaintiff, nor his ancestor, predecessor or grantor, was seized or possessed of the premises within twenty years before the commencement of this action nor within twenty years before the alleged cause of action arose.

The issue thus joined was tried at a circuit court, on the 18th day of October, 1864, before the judge, without a jury, a trial by jury having been waived.

On the trial, it appeared that, on the 24th day of May, 1804, William North, and Mary his wife, daughter of the late Hon. James Duane, in consideration of the rents and cove-

nants specified and reserved, granted and devised to Thomas Thornton, "in his actual tenure now being, the privilege and right of erecting one saw mill and one grist mill on the mill seat situate and being on the south-easterly side of Schoharie creek or river, and immediately above and near to the bridge," as it was then standing "over the said creek or river, and abutting on and connecting the turnpike road leading from Albany to Cherry Valley; and also the privilege of erecting and to erect a dam from the south-easterly side or bank of said creek or river across the same (so far as the right of North and wife extends), for the purpose of flowing the waters of said creek or river for the use of said grist and saw mill, and for the use of such mills as might be erected thereafter by North and wife, their heirs or assigns, below the bridge; and also the privilege of taking, using and enjoying so much of the land adjoining the said mill seat as should be absolutely necessary to and for the accommodation of the said grist and saw mill, *restricting and binding* Thornton, *his heirs and assigns*, to the land contained *within one chain in breadth*; the same having been heretofore reserved by the Hon. James Duane aforesaid;" to have and to hold the said mill seat, mills to be erected thereon, land and dam forever; upon condition that Thornton, his heirs, executors, administrators and assigns, should pay therefor to their grantors, their heirs, executors, administrators and assigns, $100, in half-yearly payments, payable on the 24th day of May and November in each year, and upon condition that Thornton, his heirs and assigns, should at all times keep the said dam in such repair as to allow the water of said creek or river to pass by or through his mills at all times, in such manner and quantity as might be necessary for the purposes of the mill or mills to be erected below the bridge by his grantors, their heirs and assigns. The grant contained a provision for re-entry, if the rent should at any time remain unpaid for forty days, or any other of Thornton's covenants should be violated.

Thornton entered into possession under this grant, occupied the premises and erected mills thereon, and died in

1813. He was succeeded by one Tiffany, and the latter by John S. Brown, who, in 1838, granted and conveyed the premises in question (subject to the rents and conditions contained in the grant from North and wife to Thornton), by a warranty deed, in usual form, to Henry M. Brown and his heirs, which deed was duly recorded in 1838. Henry M. Brown succeeded John S. Brown in the possession, and, on the 14th day of April, 1859, conveyed the premises in question (subject to the same covenants) to the defendant, his heirs and assigns. In 1821 Delia North became seized of all the estate, property and rights of William North and wife, in the premises in question, and was, in 1828, married to the plaintiff, Henry Saunders. The defendant and his predecessors, under whom he claims, paid the rents reserved up to May, 1863. On the 25th May, 1863, the plaintiffs served upon him a notice in writing, dated May 20th, 1863, that his term would expire on the 24th May, 1863, and that they thereby required the defendant to remove from the premises in one month after service of that notice. The defendant moved to dismiss the complaint upon the following grounds:

1st. That the deed to Thornton was a conveyance in fee.

2d. That the plaintiffs seek to recover certain lands which they describe as the "mill seat;" the deed to Thornton did not convey the mill seat; Thornton was the owner of the mill seat before, and admitted to be the owner on the face of the deed. The deed to Thornton merely granted and demised the privilege and right of erecting and to erect mills, etc., on the mill seat "in his actual tenure now being," and of erecting dams above, and using adjoining premises for mill purposes; the thing granted was an easement merely, to the grantee as the previous owner of the mill seat, by the grantors as owners of adjoining premises, and being a mere easement it was not necessary to use the word *heirs* to convey an inheritance, for the reason that an easement would descend as an appurtenant.

3d. The plaintiffs have treated the deed to Thornton as a conveyance in fee, and are concluded to deny it.

Statement of case.

4th. The defendant has acquired an estate in fee by adverse possession. He and those through whom he claims have been in possession, claiming to own in fee, for more than sixty years.

The court denied the motion overruling each point. To these rulings the defendant excepted. The court then stated separately the facts found, but did not, in the facts found, state whether or not, the defendant and those under whom he claimed had been in possession, claiming to own in fee, for more than sixty years, but found all other facts in the case substantially as above stated. It was also found that the defendant was in possession when the notice to remove was served and when this action was commenced and that the value of the use of the premises from May 24, 1863, was $230. As a conclusion of law, it was held and decided that the conveyance and lease from William North and wife to Thomas Thornton, was a lease and conveyance of the real property therein described, for and during the life of Thornton only; that the plaintiffs were entitled to recover of the defendant the possession of said real estate described in the complaint, with $230 for the use and occupation thereof, and costs. Judgment was ordered accordingly. The defendant excepted to the finding that Thornton had only a life estate in the premises in question, and that the defendant was not, and that the plaintiffs were the owners of the property. Judgment having been entered as ordered, the defendant appealed to the General Term, where the judgment was reversed and a new trial ordered, and the plaintiffs appealed to the Court of Appeals.

*D. C. Beattie,* for the appellants, cited *Goodtitle ex dem. Paul* v. *Paul* (2 Burr., 1089); *Osborn* v. *Marquand* (1 Sand., 457); *Sisson* v. *Barrett* (2 N. Y., 406); 6 Greenl., 436; 15 Maine, 218; 6 Cow., 677; 1 Saund., 321; 4 Kent's Com., 4 etc.; Hill & Denio, Supp., 93; 4 Kent's 5, 6; Co. Litt., 42; Co. Litt., § 1; 2 Black Com., 298, *et seq.*; Bouvier Law Dic. Title Deed; 6 Hill, 352; *Craig* v. *Wells* (11 N. Y., 320); JEWETT, Ch. J., in *French* v. *Carhart* (1 N. Y., 102); *Brewer*

v. *Irish* (12 How., 481); *Johnson* v. *Whitlock* (13 N. Y., 344); *Hunt* v. *Bloomer* (3 Kern., 344); *Newell* v. *Doty* (33 N. Y., 83); 2 Keyes, 21; S. C., 37; 32 N. Y., 427; 10 Bosw., 148; 6 N. Y., 233; 11 N. Y., 416.

*Anson Bingham*, for the respondent, cited *McKinnon* v. *Bliss* (21 N. Y., 206); *Hoak* v. *Long* (10 Serg. & Rawle, 9); *Dominy* v. *Miller* (33 Barb., 389); 1 Platt on Leases, 657; Taylor's Land. and Ten., §§ 55, 56; *Livingston* v. *Tanner* (14 N. Y., 64); *Torrey* v. *Torrey* (id., 430); *Bradley* v. *Covel* (4 Com., 349); *Philips* v. *Covert* (7 John, 4, note *a*); *Mann* v. *Lovejoy* (1 Ryan Mo., 355); *Doe* v. *Bell* (5 Term. R., 163); *Doe* v. *Spence* (6 East, 133); *Roe* v. *Ward* (1 H. Bl. R., 97); 4 Kent, 112; *Jackson* v. *Bryan* (1 John. R., 325, 326); *Bradley* v. *Covel* (4 Cow., 350); *Jackson* v. *Salmon* (4 Wen., 327); *Leighton* v. *Thud* (1 Ld. RAYMOND, 707); *Bright* v. *Darby* (1 Term. R., 159); *Doe* v. *Donovan* (2 Campb., 78); *Kemp* v. *Barrett* (3 id., 510); *Goodtitle* v. *Bailey* (2 Cowper, 597); *Jackson* v. *Blodget* (16 John., 178); *Jackson* v. *Waltermire* (7 Cow., 383); *Hathaway* v. *Power* (6 Hill, 453); 4 Cruise Dig., 26; 4 Kent, 468; 2 Bl. Com., 298; 2 Platt on Leases, 47, 48; 4 Cruise Dig., p. 290, § 73; 2 Platt on Leases, p. 480; *French* v. *Carhart* (1 N. Y., 102); *Livingston* v. *Ten Broeck* (16 John., 23); *Welee* v. *Hornby* (7 East, 199); *King* v. *Osborn* (4 East, 327); *Doe* v. *Ries* (8 Bing., 178); *Jackson* v. *Harrison* (7 Cow., 323.)

LEONARD, C.   The question of principle concern is the duration of the lease from North and wife to Thomas Thornton.   The omission of words of inheritance, in the *habendum* clause, imports an estate for life only, as the law existed when the lease was executed in 1804.   This is the clause in which the duration of the estate ought to have been stated according to the usual rules and forms of conveyancing.   The word "heirs" which would constitute a perpetual term is not there, and this clause standing by itself, grants an estate for the life of the grantee only, and does not extend to his heirs.

We are not, however, confined to a consideration of that clause, in determining the true construction in this respect. Every part of the instrument may be resorted to for the purpose of ascertaining its true meaning and the intention of the parties. " In a deed, if there be two clauses so totally repugnant to each other that they cannot stand together, the first shall be received and the latter rejected." (Shep. Touch. 88, Preston's ed.)

The deed is to be construed most strongly against the grantors. The words used are their words, and if equivocal, that shall not benefit the parties using them. (*Hathaway* v. *Power*, 6 Hill, 453, 457.)

Referring to the deed, in the granting part, and in describing the premises granted, are the following words : " And also the privilege and right of taking, using and enjoying, so much of the land adjoining the said mill seat as may be absolutely necessary to, and for the accommodation of the said grist and saw mill, restricting and binding the said party of the second part (the lessee, Thornton), *his heirs and assigns,* to the land contained within one chain in breadth, from the bank of said creek or river, the same having been heretofore reserved by the Hon. James Duane, aforesaid." The inquiry arises, why restrict and bind the heirs if they took no estate ? If the lease granted an inheritable estate, those words were appropriate, and had a direct meaning and force. If not, they are without any significance. We are not to assume that they are used inadvertently or without meaning. The word "heirs," as here used, indicates that they were to take the estate, in case the lessee died possessed of it, and were limited by the same restriction as the ancestor. The adoption of the word "heirs," in this connection, is repugnant to the limitation of the estate for the life of the lessee, arising from the want or omission of that word in the *habendum* clause. It occurs in the premises, a part of the lease prior to this clause, and of the most considerable importance to the lessee. It is no more probable that the word was there included unadvisedly, than that it was so omitted in the very

next clause of the lease. In my opinion, this use of the word
"heirs," is repugnant to the construction assigning to the
lessee a life estate only, as claimed for the plaintiffs by reason
of the omission of that word in its appropriate place.

The rules of law, before referred to, demand this construc-
tion. It is also in harmony with the use of the estate, as one
of inheritance, since the death of Thornton in 1813. The
lessors have not, nor have their heirs, been in the possession
of the premises or privileges granted since that period, when,
if the plaintiffs are right in their claim, the term granted was
at an end; nor have they ever refused to receive the rent
reserved by the lease, but it has been regularly paid by the
occupants of the premises as upon a perpetual lease. While
I do not regard the payment and receipt of rent as an estoppel
to the claim of the plaintiff, it is important evidence, tending
to prove an admission of the claim of the defendant to hold
the premises, under the lease, in perpetuity. The small rent
reserved must have been for many years past a mere nominal
sum, and had not all parties acted on the belief that the term
granted was perpetual, the plaintiffs would long ago have
found it to their interest to claim their legal right of re-entry.
The presumption is very decided, that they acted upon the
original intention of the grant, as conveying an inheritable
estate, which the plaintiffs could not interrupt or determine,
while the rent was paid and the covenants and conditions of
the lease were performed.

The word "heirs," where it occurs in other parts of the
lease, was necessary, as the law existed at its execution, to
preserve a cause of action against them in case the lessee
died, leaving rent unpaid, or covenants broken, where dam-
ages had accrued in his lifetime. Such a use of the word in
the conditional or *reddendum* clause, and in the covenants of
the lessee, is not therefore inconsistent with the claim of
the plaintiffs.

Nor is the argument conclusive against the plaintiffs, drawn
from the recitals in the granting portions of the lease, wherein
it is stated that the premises are in the actual *tenure* of the

lessee, and have been *reserved*, theretofore, by James Duanc. I use the word premises, for the reason that the grant of the privilege to erect mills carries the site or land upon which they are to be erected, by implication, and the grammatical construction applies the word "reservation" to the land as the last preceding subject, to the use of which the lessee and his heirs are restricted. Again, the word tenure, in its legal signification, is applicable to a leasehold possession for a term of years, or for life, as well as to a fee simple, which the defendants' counsel assumes that it implies. It signifies the manner of holding, only. The word "reservation" is frequently used in deeds and in statutes, as well as in common parlance, to refer to lands as well as to incorporeal rights. A similar use of the word occurs in *Corning* v. *Troy I. & N. Factory* (40 N. Y., 191). There is no conclusive and satisfactory argument to be derived from a reference to these phrases as used in the lease. These recitals or averments are not essential; they are incidental or collateral to the principal thing, and may be supposed not to have received the deliberate attention of the parties. In such cases the doctrine of estoppel does not apply. (1 Greenleaf's Ev., § 26.)

I prefer to rest the case for the defendant upon the use of the word "heirs," in a sense repugnant to the limitation of the term for the life, only, of the lessee.

The plaintiffs' counsel also urges that the exceptions to the legal conclusions of the judge, which were in their favor at the circuit, are insufficient.

There is a separate and proper exception to the finding that Thornton had only a life estate. Unless this legal conclusion had been arrived at by the judge, there could have been no judgment for the plaintiffs. The judge was in error as to that conclusion, and that was sufficient to reverse his judgment.

The judgment of the General Term should be affirmed, and the judgment made absolute against the plaintiffs, with costs, according to their stipulation.

GRAY, C. I am for affirming the judgment appealed from, but for a reason so different from the one upon which my brethren have placed their judgment, that I deem it proper to state wherein we differ and upon what grounds I place my judgment. Among the reasons assigned by the respondent's counsel why the judgment of the General Term should be upheld, the first is that the words "in his actual tenure now being," used as they manifestly were as a part of the description of the premises granted, was of itself an admission on the part of North and wife that the title to the property was in Thornton, and that the only object of the grant to him was to confer upon him certain mill privileges claimed by North and wife as an appurtenant to the mill seat used by him. This is claiming for those words an interpretation never conceded to them in the connection in which they are here used, and I am not aware that such was ever before claimed to be the object of using them. It is not unusual in grants of lands or of the use of land, either before or after a description of the premises by metes and bounds, to add by way of further and sometimes more definite description the words "now in possession of the said party of the second part." If the word "tenure," as here used, amounts to anything by way of concession, it is one on the part of Thornton that he held the mill seat for North and wife, from whom he was then acquiring a right to enjoy it in future. As the proofs stand, both parties claim under North and wife. Mrs. North is described as the daughter of the late Hon. James Duane, from whom she doubtless derived her title, and now, because after the grant of the right to use not to exceed one chain of land adjoining the mill seat, were the words "the same having been heretofore reserved by the Hon. James Duane aforesaid," it is claimed that all the rights granted to Thornton to enjoy the mill seat had been reserved to Duane, and that nothing in reality passed by the grant. A reservation in the sense in which it is claimed on the part of the defendant is not of the land granted, but of certain privileges connected with it. To support this proposition as

to the reservation, two things must be established: 1st. That
Thornton and not North was the owner of the mill seat, and
hence that nothing was conveyed to Thornton except the use
of some right of North's to be used upon it. 2d. That the
reservation extended beyond the right of Duane to use one
chain of land. Both of these propositions must be estab-
lished or the position of the defendant is not available. The
first cannot be, as we have already shown, and that the second
cannot is quite clear. The mill seat is described as being on
the south-easterly side of Schoharie creek, near to and imme-
diately above a bridge over the creek. The right granted
was to erect upon it one saw mill and one grist mill, and
then, for the purpose of operating the mills, the right was
given to abut a dam against the same south-easterly side
of the creek, and to extend it so far across the creek as the
right of the grantors to the waters of the creek extended,
and then, as an appurtenant to the mill and in no other way
connected with the mill seat, the right was given to use not
to exceed one chain of adjoining land, the use of which had
been theretofore reserved to Duane, and to this extent and
no farther can the reservation be deemed to have extended.
But why should the reservation to Duane have been men-
tioned? He was dead and the reservation died with him.
(*Boon* v. *Miles*, 21 Wend., 290, 292–3.) The next ques-
tion arising as to the construction of the grant, is whether
the estate granted was for the life of Thornton only, or
in perpetuity. My brethren regard it of the latter char-
acter. I do not; and in this our difference of opinion
consists. The grant of the right to use the mill seat is
not to Thornton and his heirs; nor is there anything in the
premises or *habendum* part of the deed from which we can
infer that the grant was for the use of his heirs. The *haben-
dum*, so far as it restricts Thornton to the use of one chain of
land adjoining the mill seat, is made binding upon his heirs;
and the condition of the tenure is that Thornton and his
heirs shall pay rent and that they shall keep the dam to be
erected in good repair. One would reasonably infer from

reading this portion of the indenture that the grant of the use of the mill seat had been made to Thornton and his heirs, but it was not. It may be that the word heirs was omitted by mistake and the clauses to which I have referred, together with the fact that for fifty years or more, since Thornton died, the premises granted have been held as if the word heirs had been inserted, would in my judgment go far to justify a finding that there was a clear mistake in omitting its use in the appropriate place in the grant. That fact however is not found nor was the answer so framed as to render such a defence admissible. We are therefore not to look at the act of the parties to see what ought to have been in the grant or what, by mistake, was left out of it but to look at the grant as it is; it is only where the language in it is doubtful that we can look out of it and read and interpret it by the light of surrounding circumstances. There is not, so far as it relates to the duration of the estate granted, one word or expression of doubtful import; it must therefore be interpreted by what is clearly expressed in it, by legal rules of interpretation in force in 1804, when it was made. Then the word heirs, or, by possibility, some equivalent word (although it is said that "no synonym will supply its place,") was indispensable to the creation of an estate in perpetuity, and although the rule has, as stated by the late Chancellor KENT, outlived its reason, it was nevertheless inflexible when this grant was made, and until, as to future grants, it was changed by statute. (4 Kent Com., 5, 7; 1 Washburne on Real Property, §§ 52, 53, and cases there cited.) The location of the word may not be material, provided it is in some was connected with a provision that the heirs may enjoy the estate granted. (4 Kent Com., 6.) In the grant under consideration, that word is not in any way connected with such a provision. The judge at circuit was, therefore, right in his conclusion of law, that the right of Thornton in the premises was for his life only. And this brings us to the consideration of another question presented on the motion for a dismissal of the complaint, and by an exception to the report, which in

substance was that the defendant's title, by the adverse pos-
session of himself, and those under whom he claims, had
become a title in perpetuity, subject only to the rents and condi-
tions contained in the lease to Thornton. Under the circum-
stances, we may and ought to look into the evidence in the
case, and if, from the undisputed facts in it, he ought to have
found it, as it is claimed to be, we should consider and decide
whether, as a necessary legal result, the plaintiff's right to
re-enter, except for a breach of some one or more of Thorn-
ton's covenants, had been lost by the adverse possession of
the defendant and those under whom he claims, claiming in
it an estate in perpetuity, subject only to the fulfillment of
those covenants. From the time of Thornton's death in
1813, or at least from October 30, 1838 (when John Brown
conveyed to Henry Brown *and his heirs* the premises in
question, subject only to the rents, provisions and reserva-
tions expressed in the original lease), the possession became
one under claim of title in perpetuity, subject to be divested
by a failure to comply with the conditions of the grant. It
may be stated, as a general proposition, that when the tenant
for life has conveyed the estate in fee, the possession will
become adverse from his death. (3 Washburne on Real Pro-
perty, 30.) And, where no conveyance has been made, if the
reversioner permits the representatives to hold, claiming as
their own, beyond the time limited for bringing actions, the
right is gone forever. " This is regarded as settled law."
(*Jackson* v. *Harsen,* 7 Cowen, 324, 327.) " The quo animo
a possession is taken, it is held, furnishes the true test of
its character." In this case, judging from the undis-
puted evidence, the defendant, and those under whom he
claimed title, especially since the deed from John to Henry
Brown, a space of more than twenty-five years (if not from
the death of Thornton, in 1813), possessed the premises under
a claim of absolute title, subject to no other allegiance what-
ever than to pay $50 semi-annually, and keep the dam in
repair. The defendant's title was upon record since 1838.
The plaintiffs' acquiescence in his possession " is founded

on the presumption of the existence of some substantial reason, for which the claim to an adverse interest is forborne." (Angel on Limitations, 350.) That the relation of landlord and tenant establishes an allegiance by the tenant to his landlord, which prohibits the tenant from denying his landlord's title, is an ancient and just rule, which, in no degree, conflicts with the right of the defendant to interpose the defence of his adverse possession. Here, the original entry was for the life of Thornton, subject to the rent and duty to which I have referred. This allegiance, and no other, Thornton owed, and was bound to stand by it. After his death, the defendant, and those under whom he claims, if not from the death of Thornton, a space of over fifty years, certainly from the date of the deed from John to Henry Brown, a space of more than twenty-five years, have claimed an absolute title to the mill seat, subject to the precise allegiance under which Thornton entered. Neither he nor those under whom he claims have forsaken it, but stand by it, and the plaintiffs have acquiesced in it for a period that justifies the presumption that the character of the title has been changed to accord with what one claims, and the other, by lapse of time, has conceded. Every reason, which invoked and lead to the establishment of a limitation within which these actions should be brought, exists in this case, and, upon this ground alone, I am for affirmance of the judgment appealed from.

All for affirmance. Judgment affirmed, and judgment absolute against the plaintiffs, according to their stipulation, with costs.

NOTE.—This cause was twice tried. On the first trial, judgment was directed for the plaintiffs. This was reversed, and a new trial granted. Upon the second trial, the plaintiffs again had judgment, and the General Term, on appeal, again reversed and granted a new trial.